UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIFE INSURANCE FUND ELITE LLC,<br><br>Plaintiff,<br><br>v.<br><br>HAMBURG COMMERCIAL BANK AG,<br><br>Defendant. | No. _____<br><br>**JURY DEMANDED** |

## COMPLAINT

Plaintiff, Life Insurance Fund Elite LLC (the "Fund"), through its undersigned counsel, brings this action against defendant, Hamburg Commercial Bank AG ("HCB").

## INTRODUCTION

1. This action arises from HCB's unlawful disposition of collateral that the Fund owned and that HCB controlled. The collateral consisted of the Fund's beneficial ownership interest in a cache of life insurance policies. In selling this collateral in 2019, HCB had a duty to act in a commercially reasonable manner. It failed to do so, by unreasonably and negligently failing to notify the Fund of the method, manner, time, place, and other terms of the sale of the collateral, and to the extent that HCB failed to obtain the collateral's market value.

2. The process that HCB followed in selling this collateral underscores the bank's commercially unreasonable behavior. HCB controlled the collateral in consideration of a loan balance that the Fund owned to HCB. In considering whether to sell the collateral, HCB knew that the Fund was interested in purchasing it at a price at least equal to the value of the Fund's debt to HCB. HCB nevertheless refused to provide the Fund with a current inventory of the

underlying insurance policies or other information necessary to value the assets to be sold. HCB even refused to inform the Fund of the method and date of sale.

3. In fact, the Fund still does not know the value that HCB obtained in selling *the Fund's* property, and HCB refuses to disclose. The parties' legal obligations, however, require that if HCB had sold the collateral for more than the face value of the debt, plus collection costs, then the Fund would receive the excess proceeds. Since the Fund has received nothing, it follows that HCB must have sold the collateral for less than the face value of the debt, plus collection costs, notwithstanding that the value of the collateral was substantially higher.

4. In contrast, if HCB had acted commercially reasonably, either it would have sold the collateral for more than the loan balance, and the Fund would have received the excess proceeds from the sale; or else the Fund would have purchased the collateral. In either case, the Fund was harmed by HCB's refusal to act in accordance with commercial reasonableness, refusing even to market the collateral to other entities or act on the Fund's proffered interest. HCB thus failed to satisfy its obligation to act in a commercially reasonable manner. In its disposition of the collateral, moreover, HCB breached the covenant of good faith and fair dealing that is incorporated in the parties' relevant agreements and acted negligently. The Fund brings suit to seek redress for its injury from this misconduct.

## **PARTIES**

5. The Fund is a Delaware limited liability company with its principal place of business in New York, New York.

6. HCB is a privately-owned commercial bank incorporated in Germany, with headquarters in Hamburg and Kiel, Germany.

## JURISDICTION AND VENUE

7. Under 28 U.S.C. § 1332(a)(2), the Court has jurisdiction over this matter because the Fund is incorporated in Delaware and headquartered in New York. Two of its shareholders – ISM Advisors, LLC and St. George & Company, LLC – are both incorporated in Delaware and headquartered in New Jersey. The other – St. George Life Acquisitions, LLC – is incorporated in Nevada and headquartered in New Jersey. HCB is a citizen of Germany. The amount in controversy exceeds $75,000.

8. This Court has personal jurisdiction over HCB by the parties' contractual agreement and as arising from HCB's extensive business contacts, generally over time and specifically in its business dealings with the Fund, in New York.

9. Under 28 U.S.C. § 1391(b), venue is proper in this District by the parties' contractual agreement and because this is the District where the Fund is headquartered and has its principal place of business and where HCB's alleged misconduct occurred.

## FACTS

10. The collateral at issue concerns so-called "life settlements," which is the sale of a life insurance policy to a third party. Life insurance policies are assets. Owners of such policies therefore have the right to sell them and sometimes choose to do so on the open market, rather than surrendering them for cash value.

11. Buyers of these polices obtain an asset that is not tied to the stock or bond market. Unlike securities, however, life settlements are not merely assets; they are liabilities as well, because the policy owner must pay premiums to keep the policy in force.

12. With the advent of life settlement funds in the 1990s, investors had access to this class of asset on a large scale, diversifying the risk inherent in the purchase of life settlements by spreading such risk across thousands of policies.

13. The Fund was created in August 2007 through an LLC agreement by its members, ISM Advisors, LLC ("ISM"), Swiss Re Financial Products Corporation ("Swiss Re"), and Orix Capital Markets, LLC ("Orix"). ISM was the managing member when the Fund was founded.

14. The Fund became a single-purpose Delaware limited liability company engaged in investing in life insurance-linked products, primarily life settlement, that have longevity and mortality exposure. The members of the Fund agreed to contribute a total of $180 million over a ten-year initial capital commitment.

15. Shortly after its creation, the Fund sought financing for additional capital. On October 12, 2007, HSH Nordbank AG ("HSH," which became HCB in 2019), entered into a Loan and Security Agreement ("LSA") with the Fund as Borrower and a Guarantor; with ISM Insurance Agency, LLC (a wholly owned subsidiary of ISM) as Guarantor, Loan Party and Grantor; and with LaSalle Bank National Association ("LaSalle") as the Collateral Agent.

16. Under the LSA, the maximum amount of capital available to the Fund was $150 million. The LSA in effect made $1 of loan proceeds available for every $1 that the Fund's members contributed in capital. As security for this loan, the Fund granted HSH a security interest in the Fund's assets, which comprised the insurance policies the Fund owned.

17. Concurrent with the execution of the LSA, a Trust Agreement was signed on October 12, 2007, by and among the Fund as settlor and beneficiary, LaSalle as UTI Trustee and SUBI Trustee, and Wells Fargo Delaware Trust Company, as Delaware Trustee of Life

Insurance Fund Elite Trust (the "Fund Elite Trust"). Amendments to the LSA were signed on May 2, 2008 ("LSA-1"), October 7, 2010 ("LSA-2"), and July 14, 2011 ("LSA-3").

18. The 2008 global financial crisis required the German states of Hamburg and Schleswig-Holstein to inject 3 billion euros in equity and provide a 10 billion-euro guarantee in order to bailout HSH in 2009. Under these new market conditions, the LSA negotiated in 2007 was significantly off market in 2008, and HSH began to signal that it wished to exit from their commitment by transferring the loan to their "Divestments Portfolio."

19. Contemporaneous with HSH's financial difficulties, Orix and Swiss Re also suffered significant losses in 2008 and signaled at the beginning of 2009 that they too wished to exit from their ten-year commitments in the Fund. After settlement discussions proved unsuccessful, a protracted dispute among the Fund members ensued. The dispute included both arbitration and litigation.

20. As a result of these disputes and the subsequent default of a common member of the Fund in July 2012, an individual named Zoran Fotak came to control the equity of the Fund through entities in which he held the sole or controlling interest. HCB knew of Fotak's 100% equity interest in the Fund and did not challenge it.

21. These disputes and the fallout from the 2008 financial crisis left the Fund in a difficult position. In order to keep the life insurance policies it held in good standing, the Fund had to make periodic premium payments. The disputes among the Fund members and the inability of the Fund to raise additional capital resulted in the Fund being in the uneasy position of owning valuable assets whose worth could plummet to zero, if the Fund were unable to make premium payments and the policy issuers declared the polices canceled.

22. The Fund therefore sought new investors and to refinance its debt to HSH. The LSA required HSH to loan funds, however, only if the Fund received capital investments. Because the Fund had received no such investments, HSH would not extend any new credit. As a result, represented by Skadden, Arps, Slate, Meagher & Flom LLP, the Fund negotiated a standstill agreement with HSH on January 23, 2013 (the "Standstill Agreement").

23. The Standstill Agreement included provisions key to this case. In particular, the agreement provided the Fund with a window of time to refinance the HSH loan. Failing that, the agreement granted HSH the right to take possession of the collateral (the insurance policies).

24. On February 1, 2013, HSH declared an event of default, and the Fund voluntarily released the collateral to HSH, as provided in the Standstill Agreement, to avoid foreclosure or a Chapter 11 bankruptcy filing that would have caused a delay resulting in the majority of the life insurance policies constituting the collateral to lapse and lose all their value.

25. Although the Standstill Agreement granted HSH the right to take possession and dispose of the collateral, it did *not* transfer title of the collateral to HSH. Nor did the agreement modify HSH's legal obligation to act commercially reasonably when disposing of the collateral.

26. In short, HSH took over responsibility for the collateral to protect its own investment (its loan to the Fund), but it retained an obligation to the Fund to act reasonably when selling or otherwise disposing of the collateral. This arrangement reflected the fact that when the Standstill Agreement was signed, the outstanding loan balance on a mark-to-market basis was approximately $55,675,666 and the face amount of the death benefit of the life insurance policies was approximately $148,895.023.

27. Over the next six years, HSH kept the Fund apprised of the status of its property and sent the Fund quarterly collateral reports and loan statements. This course of performance

was consistent with the terms of the Standstill Agreement, by which the Fund remained the owner of the collateral and indebted to HSH.

28. HSH's communications with the Fund from the time the collateral was delivered to HSH in February 2013 into March 2019 demonstrated two critical features of the parties' relationship. First, HSH's conduct showed that the Fund's loan balance was still outstanding. This is important because had the Fund given up *title* to the collateral, the loan balance would have been offset by the value of the collateral. Second, by sending the Fund quarterly collateral reports, HSH was acknowledging that the Fund remained the owner of the collateral.

29. In February 2018, HSH's regional government owners reached a deal to sell their controlling interests to a buyout group led by Cerberus Capital Management LP ("Cerberus") and J.C. Flowers LLC. On March 3, 2019, HSH advised the Fund of its name change to HCB and of the move of the Facility Office for the loan from Luxembourg Branch to HCB's Head Office in Hamburg, Germany.

30. On May 30, 2019, Fotak was contacted by Boris Ziser, a partner at Schulte Roth & Zabel LLP. Ziser advised Fotak that, given the change in control of HSH, he was working on a sale of the collateral under the LSA, but he gave no indication on whose behalf he was acting. Fotak reminded Ziser that he held the equity interest in the Fund, and thus in the collateral, and would be an interested party in any proposed sale.

31. On September 24, 2019, Ziser and his partner Thomas Weinberger again reached out to Fotak. As Fotak had bee involved in transactions that Ziser and Weinberger were involved in, he was familiar with these attorneys. Once again, the discussion was focused on the sale of the collateral. Considering that neither Ziser nor Weinberger appeared to know much about the current status of the collateral itself, Fotak sent them the most recent collateral report

that he had received from HCB on July 23, 2019, in which the Bank made no mention of a proposed sale of the collateral.

32. Fotak was familiar with Ziser and Weinberger from when they were partners at Stroock & Stroock & Lavin ("Stroock"). Weinberger had acted for Avon Capital Holdings LLC when it became a common member in the Fund. Ziser had acted for Grey Wolf Capital Management LP when Fotak was negotiating a financing arrangement for the Fund when one of its common members defaulted on a capital call. Stroock had also acted for HSH when the LSA was executed in 2007.

33. Considering that Ziser and Weinberger had not made clear whom they were acting for, on September 26, 2019, Mr. Fotak emailed them to make that inquiry. He received no immediate response.

34. On September 30, 2019, Fotak followed up with Dr. Holger Claessen, HCB's point person on the loan to the Fund, and inquired as to the timing of the Q3 Collateral and Loan Report. Fotak also asked Claessen if there was anything he should be aware of regarding the loan and collateral.

35. Claessen responded by email on October 1, 2019, cryptically indicating that he thought Fotak had been in communication with the attorneys at Schulte Roth.

36. Hours later, Ziser responded to Fotak's September 26 email, asking whom the attorneys were representing, by stating: "We don't understand the relevance of your question."

37. When Fotak pressed Ziser further, Ziser finally, and apparently reluctantly, revealed that he was representing HCB and Cerberus, one of the Bank's minority shareholders.

38. Once Claessen appeared to confirm that Ziser and Weinberger represented HCB, Fotak immediately asked him for additional information that would allow him to prepare a bid. This included the following:

   a. A statement of account from when HSH took possession of the collateral to the present.
   b. Interest accrued and paid on the Loan.
   c. A breakdown of all premiums paid per policy.
   d. A breakdown of all death benefits received to date.
   e. A pro-forma for premium payments (assuming no deaths) by policy for the remainder of the year.
   f. Copies of materials sent to third parties.

39. On October 2, 2019, Claessen sent Fotak the Q3 2019 Collateral Statement and cash statement and stated: "In response to your e-mail, attached is the Q3 collateral and cash statement which we believe is the appropriate information to provide at this time."

40. Fotak had made it clear to Ziser and Weinberger that he believed the collateral was worth in excess of the loan balance outstanding, and that the Fund would like to bid on it. To finalize his bid, however, he told them he required the same detailed information provided to all prospective purchasers.

41. HCB failed to provide Mr. Fotak with the information he requested. Fotak asked HCB to confirm that it was refusing to provide him with the additional information he had requested. Neither Fotak nor the Fund has never received a response.

42. On October 8, 2019, Fotak sent an email to HCB, Ziser, and Weinberger, indicating that the Fund was prepared to make a bid, and reiterated his request for additional information. On October 10, 2019, Ziser informed Fotak that the collateral was sold on October 4, 2019. Mr. Ziser provided no additional information about the sale.

43. The Fund has received no information from HCB about its sale of the collateral, continuing to fail to provide such information in response to the most recent request for information by Fotak to Claessen on August 20, 2020.

44. The collateral had a value in excess of the loan balance owed by the Fund to HCB. The Fund was prepared to bid in excess of the loan balance.

45. If HCB had diligently marketed the collateral to prospective buyers, including the Fund, as it was required to do, the collateral would have sold for more than the face amount of the debt and the Fund would have received the funds in excess of the loan balance. Alternatively, it would have had an opportunity to purchase the collateral.

46. Instead, HCB sold the collateral for less than the loan balance and via a sale process that was not commercially reasonable. As a result of HCB's failure to act in a commercially reasonable manner, the Fund was harmed.

## COUNT I
**Breach of the Duty of Commercial Reasonableness**

47. The Fund incorporates the allegations above.

48. Under UCC 9-610, as adopted in New York, HCB had the duty to act commercially reasonably in connection with every "aspect of a disposition of collateral, including the method, manner, time, place and other terms."

49. Under UCC 9-627(b), as adopted in New York, a disposition of collateral is commercially reasonable if it is made (1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

50. In disposing of the collateral at issue, HCB breached its duty of commercial reasonableness, including by failing to disclose any details about the upcoming sale to the Fund, despite the fact that HCB knew the Fund was an interested part; failing to disclose sufficient details regarding the collateral to the Fund, despite the fact that HCB knew the Fund was an interested party; and failing to otherwise notify the Fund of the method, manner, time, place, and other terms of the sale. HCB also breached its duty of commercial reasonableness to the extent that it did not obtain the collateral's market value. Indeed, HCB did not even seek to market the collateral to any other entity other than the final buyer.

51. As a result of HCB's breach of its duty of commercial reasonableness, the Fund has been harmed. If HCB had acted commercially reasonably, the Fund would have had an opportunity to purchase the collateral, or the collateral would have sold for more than the face amount of the debt and the Fund would have received the funds in excess of the loan balance.

## COUNT II
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

52. The Fund incorporates the allegations above.

53. The reference agreements between the Fund and HCB, including the Standstill Agreement, include an implied covenant of good faith and fair dealing.

54. Under the implied covenant of good faith and fair dealing, HCB was obligated not to anything that would have the effect of injuring the right of the Fund to receive the fruits of the parties' agreements, including the Standstill Agreement.

55. HCB breached the implied covenant of good faith and fair dealing in excluding the Fund from the process of the sale of the collateral through its failure to provide the Fund with the information it requested regarding the sale and by failing to provide the Fund with

information regarding the method, manner, time, and place of the sale, despite the fact that the Fund requested it before the sale.

57. These failures and refusals had the effect of precluding the Fund from acting on and benefitting from its rights under the parties' agreements.

57. As a result of HCB's breach of the implied covenant of good faith and fair dealing, the Fund has been harmed.

## COUNT III
### Negligence

58. The Fund incorporates the allegations above.

59. HCB owed a duty of care to the Fund in connection with its maintenance and disposition of the collateral.

60. In disposing of the collateral as it did, HCB breached the duty it owed to the Fund. HCB's failure to notify the Fund of the method, manner, time, place, and other terms of the sale of the collateral at issue, including where the Fund requested such information before the sale, constituted a departure from the ordinary standards of care of one maintaining and disposing of the property held by another.

61. As a result of HCB's negligence, as was reasonably foreseeable to HCB, the Fund has been harmed.

## RELIEF DEMANDED

WHEREFORE, Plaintiff demands judgment and permanent relief against the Defendant as follows:

a. Compensatory damages on Plaintiff's claims in amounts to be determined at trial, together with pre-judgment interest at the maximum rate allowed by law.

b. Reasonable costs and expenses incurred in this action, including legal fees to the extend allowable by law.

   c. Such other and further relief as the Court may deem just and proper.

Dated: October 14, 2020

/s/ Timothy Cornell_____
Timothy Cornell (BBO# 654412)
Patrick J. Dolan (BBO# 564250)
CORNELL DOLAN, P.C.
Ten Post Office Square, Suite 800 South
Boston, Massachusetts 02110
E-mail: tcornell@cornelldolan.com
pdolan@cornelldolan.com
*Application for admission pro hac vice forthcoming*

Edward Normand
ROCHE CYRULNIK FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016
Tel: (646) 970-7513
tnormand@rcfllp.com

*Counsel for Life Insurance Fund Elite LLC*